Good afternoon, ladies and gentlemen. I want to thank Council for accommodating us on rescheduling this hearing, which had to be postponed, and thanks for working together to find an acceptable date that worked for everyone. I also want to thank many amicus briefs we got. We didn't receive one from the Onion, to my dismay, but maybe next time. And I want to thank my colleagues for coming back for this hearing, and Judge Smith and I are very grateful to Judge McShane from the District Court of Oregon. Thank you for taking time out from your very busy duties down here to help us out on the nights. And with that, we'll hear our argument in the scheduled case of Epic Games v. Apple. Mr. Goldstein, you may proceed. Thank you, Your Honors. May it please the Court. And I've reserved five minutes for rebuttal. I, of course, represent Epic Games, and we're joined here today by the United States and on the briefs by a coalition of a majority of states' attorneys general and the nation's leading antitrust scholars. And together, I think we've identified what are at least two significant legal errors by the District Court, and those are the District Court's holding that unilateral contracts aren't subject to Section 1 and the District Court's failure to balance pro and anti-competitive effects under the rule of reason. But with respect, if the Court were to just stop there, if it were just to reverse and remand the District Court to conduct that balancing, I think it will not have addressed what is the most significant legally, economically, technologically holding of the District Court, and that is the District Court's holding that what Apple is doing here is legitimately and pro-competitively creating a wall to guard in its product, and that weighs very heavily in favor of sustaining what Apple has done here. And I'd like to focus on that, if I could, because I think that's really where the rubber hits the road, and give you just very briefly the three reasons I think that's just wrong. Counsel, before we get there, I'm kind of interested in the relevant market issue first, if you don't mind. In this case, did the District Court adequately consider information costs and switching costs as defined in CODAC when it defined the relevant market? Well, Your Honor, so there's the foremarket question and the aftermarket question. The switching costs go to the question of whether competition in the foremarket will temper anti-competitive behavior in the aftermarket, and we think the answer to that question is no. I'll be clear that CODAC is just one of several entry points to the rule of reason. I'm not trying to avoid it. Yeah, the new Cal. Exactly. So new Cal, the fourth factor, is really focused here on, well, you know, what's going on? Do we really care what Apple is doing, given that Apple has to compete against Android? Isn't that competition going to solve all of our problems, or is there something special about this market that creates a real problem where consumers are locked in? And let me give you what I think are our two best arguments about that. The first is that consumers are stopped by Apple from knowing what the relevant costs are. Remember, when it comes to in-app purchases of virtual goods, Apple will actually let consumers buy goods off of the web. But as the District Court explained in her UCL ruling, Apple has these anti-steering rules that prevent us from even telling consumers that they have a cheaper alternative. And that's what I think makes this a stronger case than CODAC, is because there there was a change in policy. Here the policy has never changed. Consumers just don't even know what the relevant costs are. Doesn't CODAC help you in the for-market concept? I think absolutely it does. CODAC teaches here that you can, I think, look at the iPhone or the operating system. I think those two things really do come together. I get that. That that really is the for-market, and that you have the competition between Apple and Android there. But as your question suggests, look, I pay $1,500 for my iPhone, and we're talking here about something like a 30% tax on a dollar transaction later on. It's very unlikely. What the Supreme Court teaches in CODAC is that I don't really understand the lifecycle cost of that. I might know that there's a walled garden, but I'm not switching between Android and iPhone over this marginal cost. But, counsel, didn't the court find that when it came to switching costs, it was totally in the dark as to the magnitude of the switching costs and why people may or may not switch? And the court found you simply didn't provide any consumer data. In fact, I mean, some people switch, don't switch because they're loyal, because they like security. Me, I'm just too lazy to switch. I mean, there's lots of reasons. People may or might switch, and there was just a failure there of proof. And I will say this is probably, you know, the district court's opinion, we respect all the effort the district court put into this. The district court's opinion has a bunch of factual findings in our favor, and then it kind of changes gears in the conclusions of law. This is a place where the district court is against us. And I'll just be clear about that thought that we did not prove that people were locked in and unable to change or why they didn't change. But I don't think we have to win that point in order to win under CODAC. Really, as NewCal explains, what we're trying to prove to you is that there's nothing going on when Apple competes against Android that causes them to behave pro-competitively when it comes to the app store and to the in-app payments. Whatever reason people don't switch, they don't switch. The data is about 2% a year switch. Even across the life cycle of the phone, it's not very much. So people stick with their phones, and that's our point. When you buy an iPhone, you tend to stick with it. Maybe you love it. Okay, I don't have any problem with that. But the thing I will say that you love is the parts where there's competition. You love the phone itself. You might love the apps. There's competition there. But Fortnite users don't stick with their iPhones necessarily. Wasn't the finding that 90% of them who have iOS subscriptions are playing on non-iOS devices? Well, it's certainly—I don't know the exact number, but I'll take the point. 87%. Footnote 277, I took. Right. So we now are going to diverge a little bit on what the relevant for market is, and I want to recognize that because if we treat the for market as the phones, people do stick with their phones. You make the point, Your Honor, that with respect to some applications, not a lot of them, some applications like Fortnite, people will use another platform. That was why the district court looked at this mobile gaming transactions market. But you can't just make this a case about Fortnite. On that assumption, what the district court said is Apple has 52% to 57% market share. And also, not only that, it is immune to price competition. This 30% thing that has delivered to them tens of billions of dollars every year has not come down despite the fact that there are, according to the district court, these other alternatives. Before we—I understand your desire to move on to another area. I'm comfortable here. Before we get to any of the aspects of the rule of reason, we have to decide what the relevant market is. And I get your point from your brief that they didn't comply. I mean, Judge Rogers didn't comply with Kodak, NewCal, and as a result, she just got the market wrong. But in order to get the market right, you've got to show these various things such as the information costs, the switching costs, and I think you just basically said that didn't get treated. So does that mean if we agree in principle that Judge Rogers got the law wrong, we have to send this back to Judge Rogers to redo the issue of what is the relevant market? No. You could. I confess that you could start at the beginning of the case and stop. And if not, if I may add, where in the record would you refer us to to fill in the blanks of the information costs and the switching costs, which I understand the district court would have had to find in order to get you where you want to in terms of the relevant market. You are correct, Your Honor, that under the correct substitutability analysis for determining the market in the first instance, I think you would have a very hard time you deciding that yourself. Now, what the district judge did do is say, we had offered up this iPhone with its operating system. The operating system is the market. And the district court said, no, the operating system isn't sold separately. Phones are sold separately. And we could just accept that. But the real competition here is obviously between iPhone and Android. But if you really wanted to get this to be dug through in detail, I do think then, yes, you would give it back to the district court. But the reason I don't think you have to do that is that no matter what market is involved, we are getting to the rule of reason. I agree. I agree with you that ultimately that's what you'd have to do. But I guess my question would be, if you're right about the rule of reason, I mean, excuse me, the relevant market, and we have to send it back to the district court, can we get to the rule of reason analysis that the district court did in a number of areas? Or do we just have to wait for the district court to reconsider the relevant market before we get to those other issues? I understand the question. I think the former, and that is that you can reach this question because no matter what market is involved, I haven't been able to conceive of a theory of the case in which Apple should legitimately be immune from antitrust scrutiny. That's really what we're talking about here, is that is there a market definition under which Apple, despite having all of this inability to withstand price competition. That's because it's the walled garden concept? Well, that is, I think, their justification, right? And that's what we would talk about if we got to the rule of reason. But my point is that under the district court's conception of what the relevant market is, under our conception of what the relevant market is, under Kodak or not Kodak, eventually we are getting to the rule of reason. And so it is true that analytically antitrust law starts at the beginning with market definition. But one of the interesting things is the parties aren't fighting so much, interestingly, about market definition in their briefs. We both kind of touch on it and suggest, boy, the district court didn't get this. The reason we're doing it is we think the where we go from there, because we're not arguing really hard for per se rules, is we are arguing for the rule of reason anyway. And under her definition or ours, we end up there. And I would prefer, and I think everybody in the court would prefer, hopefully, not to just be back here in a couple of years to just do what we do. Let's say you're correct. The case law, as I understand it, suggests that before we can really do rule of reason analysis, certainly in terms of relative harms and so on, you've got to know what the market is. If we have to send it back, would the parties want us nonetheless, since the district court did do some rule of reason analysis, maybe not all of it, but some, would you want that analyzed as well for the benefit of all the parties? Yes, and that is actually the three points that I was getting to. And that is, so on the theory that, okay, it goes back, and the district court's going to really fine-tune what the market is. What I do know is that if you just do that in remand, the district court, when it does the rule of reason weighing, which we think is required, or even if there's no weighing, the district court's going to say, look, the first time I held that this walled garden thing is an important pro-competitive justification. The Ninth Circuit hasn't told me otherwise. And we're just going to end up back here. And that's where I think, to be honest, the real action, whether we're right or wrong, that's where the beating heart of the case is. So you're saying, don't worry so much about the relevant market. We really want you to analyze what the court did with respect to, say, tying product, what the court did with respect to the contract issue, whether or not that falls under Section 1 and so on. Right, and I'm not saying don't worry so much about the relevant market. I respect the point that, look, the cases say you have to know what the market is. I'm just saying don't stop there. Because the district court did a lot of other things, and the district court, if it isn't given other instruction and other guidance by the court, is just going to do them again, and we'll end up back here, and we'll know what the relevant market was, but two years will have gone by, and nobody will have gained anything. So if I could then turn to this question of the walled garden. So that was what Apple says is so important here. There's privacy and there's security from that. We're engaging in the pro-competitive product differentiation of the iPhone, and I think that's wrong for three really important reasons. The first is you don't have to do that. Sell the iPhone. Tell your customers to use your app store and your in-app payment. Tell them that's a walled garden for them, and you're perfectly fine. That is to say that it's not intrinsic in your product definition to keep us from competing against you. Can I ask your, I mean, there's so much to talk about we could talk about for days, but let's get to this, what the district court referred to, and I want to use her language here, the privacy security justification. As I look at the cases, it seems that what she cited are almost entirely vertical cases. And, of course, codex says that doesn't work. So would you please comment on the vertical, horizontal aspect of this and why you think the district court was wrong in taking what she thought were pro-competitive justifications? Yes, so we might call this the legion question, and that is when the Supreme Court has said that you can engage in vertical restraints, say you change your own path of distribution in order to differentiate your market, that is a pro-competitive justification. This does not look anything like that because what Apple is instead doing is eliminating horizontal competition. So we have their app store. Who are the horizontal competitors? Well, Epic wants to offer an app store. Maybe the district court said Disney would want to offer an app store that would be even better for children. What is our horizontal competition with respect to IAP? Well, they have their own payment solution. Well, Epic wants to offer a payment solution.  People could produce things that are cheaper and safer and greater privacy. And so it has never been okay under the antitrust laws to eliminate by contract or individual action your horizontal competitors to say, look, I have a better product. You know what makes my product better? That I have no competition. The only thing that is kept out by Apple's walled garden is competitors. That's the only people who are on the other side of it because Apple can tell you, use my app store, use my IAP. And in fact, if the district court really thought that it was necessary, Apple could review alternative app stores. Apple could review the apps even if they're downloaded by somebody else. Apple could review the IAP. But what it cannot do is just say, I'm going to now call this one product. I'm going to call it an iPhone and I'm going to stick into it an app store. I'm going to stick into it an IAP. The Microsoft case says you can't do it in one app, right? That's exactly right. And so the district court, I think, confused the fact that Apple had integrated things, right? It's selling an iPhone and inside is the app store and IAP and treated that as meaning that there could not be separate markets for the things inside. And Microsoft says, no, look, if you have the browser in there, those are two different things. The fact that you've decided to bundle them together is what makes it tying. Microsoft is licensing the software. Isn't there a difference there? Well, I don't think so in the following respects. Remember, Android, for example, is a licensed thing. All that you have Apple doing is just insisting in pure vertical integration of its own products for which there are putative competitors. What Microsoft says is that there's no excuse for not applying the general rule, which is, is there separate demand? That's what we want to know. When we're trying to decide if there are separate markets, we're trying to decide is there separate demand? And here there is obviously separate demand. I've got really good examples of it. So when it comes to payment solutions, how do I know there's separate demand? Well, Apple allows alternative payment solutions even for virtual goods. They will allow you to pay for it over the web. They just won't let you tell anybody about it. Since you want to save some of your time, I want you to think about something for when you come back. EPIC's Project Liberty seemed to be a coordinated lawsuit in public relations gambit that was strictly horizontal. It was an attack by one competitor against another competitor. Why is that an antitrust violation? Why is what we did an antitrust violation? No, no, no. In other words, you're competing. Antitrust laws are supposed to protect consumers, not competitors. So my question is, does this Project Liberty play any role in our analysis on how we should view EPIC's case? The district court really didn't like it. And so I think that you can read that from the opinion. But I don't think so. We are not competing. We want to compete. We are not allowed to offer the EPIC Games Store. We are not allowed to offer EPIC Games Store. You have your own IAP, if you will. We're trying. Not on their market, but you have your own. For which we are not allowed to have access to a billion consumers. Correct. No, I understand that. So think about that. Of course. Thank you. We're down to about three minutes, Your Honor. Thank you, Your Honor. We'll hear from the United States. May it please the Court, Nick Levin on behalf of the United States. I'm here to address several legal errors in the decision below that we think will have significant implications well beyond the instant case. I'd like to start with Section 1. The district court erred both in its holding that there is no concerted action and that it misapplied the rule of reason. So first, the district court erred by holding that the developer licensing agreement is not concerted action. Section 1 expressly prohibits contracts and restraint of trade. And that includes the licensing contract that Apple is enforcing in this case. So can I ask you about the case that was cited by the lower court, French & Sons, which says the essence of Section 1 is concerted action? And it even goes a little bit further and says both parties have to intentionally enter into an agreement to restrain trade. I mean, is EPIC, by signing this DPLA and saying we agree to its terms, intentionally going forward to restrain trade? Yes, Your Honor, and this has been a settled law since the Permanent Life Decision of the Supreme Court in 1968. The contract, by definition, joins together separate economic actors who have separate economic interests. And the contractual terms are their conscious commitment to a common scheme. It doesn't matter that someone doesn't like it. And in fact, as Permanent Life explained, it helps the coerced party to make this deemed concerted action because it provides them a means of challenging the contract and rendering it unenforceable. But you're not saying EPIC signed this contract in order to restrain competition. It signed it to get into a market. Correct, Your Honor, but the contract and the terms are binding on both parties. It's long been the law that for vertical restraints, you have parties and terms that are forced on one party. That's part of tying contracts. And here, it's important, as Paladin makes clear, every commercial agreement is concerted action subject to Section 1. And the reason why this is important is because if you exempt these contracts from Section 1 scrutiny, you may allow anti-competitive terms in them to go unpunished, especially where a dominant firm has a lot of market power but is not a monopolist. But doesn't the government's own guidance allow for these kind of DPLAs? The guidance goes to when the contracts are reasonable. But it doesn't say they are contracts. In your guidance, does it say this is unreasonable? No, we haven't taken a position that these contracts, we haven't said whether these terms are or are not reasonable. Concerted action is a prerequisite to analysis under Section 1. And our point is that these licensing agreements are concerted action. It's long been the case, you have many Supreme Court cases, General Electric in 26, International South 47, Illinois Tool Works in 2000s, where you have intellectual property contracts subject to Section 1 review. Now, some of them are upheld as reasonable, but they're subject to Section 1 scrutiny. And it's important because this is a way that market power could be exercised. And so we want to at least be able to look at the contract to see if they're reasonable. Counsel, let's argue, let's say I agree with you about the concerted action. And I do, actually. But I'm interested in your take on the balancing, which is one of the points that you all make. I don't really see any cases where the balancing was, if you will, the sine qua non of a decision being made. Sometimes we use it, sometimes we don't. I think our court in Qualcomm kind of called it out, but others are not. Our case law is inconsistent. What's the position of the government with respect to the balancing, the fourth step, if you will, in the rule of reason analysis? So we consider it an important step at the end of the analysis. We don't consider it a fourth step. And the decision that I would point the court to is the County of Tuolumne case, which I think is most directly on point. But the three burden-shifting steps are a way of deferring the need for balancing until the end of the inquiry. But do you need it at all? In other words, the previous three steps, don't they really provide you an opportunity or whoever is involved in the case to get to the very point that you have with the balancing test? No, Your Honor. They only provide a means of delaying balancing until the end. There are some cases that it's important. So, for example, if there's no... So why is that a fourth step? It's not an over... We have the three steps, and then we have all these cases that talk about balancing. And so what would you say to the district court as an instruction? At the end you have to balance? So first... Is the balancing inherent in the three steps? No, Your Honor. Go ahead. It's three burden-shifting steps. It's not a fourth burden-shifting step. And the burden's already back on the plaintiff at the start of step three, and it stays there. So that's why it's not a fourth step. The instruction is the same as all the leading treatises that Amex relied on, as the decision below that Amex relied on. It's that you have to determine the net effect of the restraint, whether it's net pro-competitive or net anti-competitive. And the three burden-shifting steps do not get to that. What they do is they provide a means of resolving case without making that determination. So, for example, if there's no anti-competitive effect, there's nothing to weigh. If there's no pro-competitive effect, there's nothing to weigh. Likewise, if there is a pro-competitive effect but a less restrictive alternative that achieves it, again, there's nothing to weigh. So it's only the weighing step where one considers whether the anti-competitive effect or the pro-competitive effect, which is the mountain, which is the molehill, that it actually makes a determination of restraint's reasonableness in the few cases that really get to the end of the analysis. And then how does the district court quantify the various elements, various components in this weighing? Does the court just describe some values that he or she sees and says, well, this is worth X and this is worth Y, and so that's the balance? No, Your Honor. It's often a qualitative determination. Cal Dental talks about what's the principal tendency of the restraint. So it looks at the anti-competitive effects. It looks at the pro-competitive effects. And it just has to make a judgment, which side is the mountain. Well, I guess what I'm asking, what I'm hearing the government say is that the balancing test is essentially a mathematical calculation. And I'm saying if that's true, then where are the, if you will, where are the digits? What are the components that go into that calculation? If you're just talking about what feels right, I guess I sort of understand what you're saying. But I don't know why that's necessary in light of the three previous steps, if that's all we're talking about. So we do think it's primarily a qualitative determination, not a quantitative one. There can be quantitative metrics that can be introduced in some cases. And forgive me, how does one make a qualitative decision without having any quantitative analysis in what we're talking about? It's the sort of judgment and judicial balancing that goes on with multi-factor tests that occurs all the time. But wasn't that made here? I mean, we went through the burden-shifting analysis, and the court said, based on everything I've seen, EPIC failed to prove in the final analysis that the pro-competitive effects weren't ultimately, that there weren't a least restrictive method to bring out the pro-competitive effects. I mean, how is a balance not made with that kind of finding? I mean, you don't have to say, I'm now balancing, right? Well, no, it should. This is a bench trial. Rule 52 says there has to be factual findings, and the court should have a factual finding as to its analysis. And it found factually that EPIC failed in the final stage of the three-part shifting test. But that's our point, is that after determining there's no less restrictive alternative, it needed to make a separate determination, is the restraint net pro-competitive or net anti-competitive? And it didn't make that determination. And if it didn't know the answer, the plaintiff loses. The burden of persuasion is on the plaintiff. And when the district court makes factual findings as part of its totality of the circumstances, what does it cite? I feel this way? This feels good? This feels bad? Or does it have numbers? How do you do this? The judge would say, for example, here. You have the foreclosure of competition that's caused by the lack of, by the walled garden. So it would have- Forgive me, counsel. That's so high level, it doesn't really tell us anything. How's the Court of Appeal going to analyze whether the balancing test was done properly if there's nothing quantitative about it? We can look at it and say, oh, we understand what the district judge was saying here. Well, where comes matter is, in particular, when you think about the nature of the pro-competitive effects found here. So you have it largely relied on for pro-competitive effects to increase privacy and increase security. Well, those aren't freestanding pro-competitive justifications in and of themselves. Like amateurism was in Alston, they're only relevant to the extent that they increase competition and increase consumer demand. And the test is the one that goes back to Board of Trade. Is the primary effect of the restraint to enhance competition or to suppress it? And it just has to give some explanation. This court did it in Paladin Associates. It did it in County of Tulemae. In both cases, the restraint was upheld. But it just has to say, where is the effect of the restraint to suppress or restrict competition? So then I'd like to turn- I see my time is up, but I'd like to turn to section- Go ahead. Make a brief argument on the Section 2. On Section 2, the most important analysis is about the monopoly analysis of the monopoly power requirements. And the district court erred in how it analyzed monopoly power here. The district court made three salient factual findings. First, that Apple had charged super-competitive prices. Second, that it had done so for years, leading to very high profits. And third, that Apple was able to set and maintain prices regardless of what its competitors charged. As it says at ER 39, nothing other than legal action makes Apple consider reducing rates or reducing prices. And that's strong evidence of monopoly power. And the court said, well, that doesn't directly prove monopoly power because you didn't also prove reduced output. But that's not what this court's cases say. This court's cases say super-competitive prices alone do not directly prove monopoly power. But that isn't what the district court found here. In addition to super-competitive prices, it also found, most importantly, that Apple was able to set prices and keep them there regardless of what its competitors did. And as Microsoft explained, that's something only a monopolist can do. Thank you, counsel. Let me just ask you one quick question. In the view of the government, did the district court make enough findings to sustain a Section 2 violation? And had it applied, in your view, the antitrust laws properly in connection with Section 2? We have not taken a position on the ultimate disposition of this appeal. You're just talking about raw law then, right, rather than the facts? So there should have been, we believe that it should have made more analysis of the, more findings for analysis of the monopoly power requirement for Section 2. It didn't consider the pricing. We think it considered it, it rejected it as direct evidence of monopoly power for wrong reasons. And even if it wasn't direct evidence, it should have been considered as part of the circumstantial proof as in the Greyhound computer case. But as for whether the restrictions are reasonable and violate the second element, we haven't touched on that or the outcome. But we do believe with Section 1 as the Section 2, there's a balancing component.  We'll hear from the State of California. Thank you. Good afternoon and may it please the Court. Josh Potashnik on behalf of the State of California. There are two main points I'd like to emphasize today. First, as both parties correctly recognize, a plaintiff need not plead or prove a concurrent violation of any other law to prevail on a UCL claim under the unfair prompt. Chavez and San Jose hold that when statutory or judicial authority establishes that certain conduct is affirmatively lawful under the antitrust laws, that conduct does not violate the UCL by virtue of its effects on competition. But UCL liability is not foreclosed merely because a plaintiff fails to carry its evidentiary burden of proving a claim under the antitrust laws or any other law. Second, this Court should carefully consider whether to certify certain state law issues, in this case, to the California Supreme Court. Some of the arguments advanced by Apple regarding the UCL would result in significant departures from existing California law. Respectfully, this Court should not resolve this appeal on those grounds without first certifying those issues to the California Supreme Court. And what issues would you identify? Your Honor, we've identified three issues that we believe may be appropriate for certification. So first, whether the Chavez-San Jose rule should be extended to a situation where a plaintiff tries and fails to make out an antitrust claim at trial. Second, whether California courts would follow the general approach to anti-steering provisions reflected in the Amex majority opinion. And third, whether, as Apple argues, a plaintiff in Epic's position may proceed only under the tethering test articulated in CELTEC or may avail itself of the balancing test that California courts have continued to apply in UCL consumer cases. Those are the three issues that we believe may be appropriate for certification, depending on how the Court intends to resolve the case. Counsel, if the UCL required an inquiry in the market definition, doesn't that really make the UCL just a duplicate of the Cartwright Act? Your Honor, the UCL doesn't require a market analysis. It's not an element of the UCL claim. It's something that is often done in UCL cases involving competition, but it's not an element of a UCL claim. The UCL, forgive me, in my mind, just basically it borrows a fetus from some other case and uses that as what it's going to write. And in this case, if you're talking about antitrust law, you need to have a claim, and if it's a good claim, then you can proceed under the UCL. Isn't that right? Well, Your Honor, that's mainly a description of the unlawful prong of the UCL, but we're talking about the unfair prong, which is a little bit different. And so what the California Supreme Court said in CELTEC is that when there's a UCL unfair prong claim premised on harm to competition, you don't need to make out an antitrust claim. In fact, the California Supreme Court expressly recognized that there will be situations where there's no viable antitrust claim, but there is a viable UCL claim. The question under the tethering test is whether the challenged conduct threatens an incipient violation of antitrust law or violates the policy or spirit of the antitrust laws, even if there's not a violation of the letter of the law. And you've read the concerns raised by several amici about the extraterritorial effect of UCL in this case. What's your response? Your Honor, so this is a case in which Apple is a California company. The contract at issue is governed by California law, and there's extensive California state court precedent holding that it's appropriate under the UCL for a court to issue an injunction restraining a California company, both in its interactions with California consumers, but also consumers in other states, particularly when the contract is governed by California law. So we think it's appropriate under California precedent to have an injunction that governs in that circumstance. Even though it governs conduct in other states where the UCL may be far different? Well, the conduct is in California in that Apple is a California company headquartered here, so insofar as decisions are made about the contracts, they're very likely to be made in California. Is EPCAT a legal remedy? Should the federal courts then even get involved with equitable relief? Your Honor, that's a question of federal law, the circumstances in which a federal court can issue injunctive relief under a state law claim. We haven't briefed that issue, but as I understand this court's precedent, that is a requirement. The court needs to go through the traditional equitable factors that apply whenever it issues injunctive relief. But we haven't briefed that issue. We haven't taken any position on that issue. Further questions? Anything you want to close with? No, Your Honor. Well, I do have one more point I'd like to emphasize. The UCL claim in this case is about the anti-steering provisions in particular, and California law is very suspicious of agreements that restrict the free flow of price information to consumers. So in our brief, we cited to discuss the Lakebrook case. It's a California Supreme Court case holding that restrictions on the free flow of price information constituted a per se violation of the Cartwright Act. So we think it's important to note that that is one aspect of California law as applied to the anti-steering provisions in particular. Thank you, Your Honor. We hear from Apple. Mr. Perry, you've been patiently waiting. Thank you, Your Honors. May it please the Court. If I could start with where Mr. Levin and the government was on balancing. The Court said, in which case has we ever said it was a sine qua non of the rule of reason? And he had one answer for you, the County of Tuolumne case. In fact, that is the only case in the history of the Sherman Act in which this Court has ever applied a separate balancing step. The Supreme Court never has. This Court did in Tuolumne. And if we go to Tuolumne, Your Honor, at 236 Fed Third, page 1160, the entire ruling on balancing is this. Any anti-competitive harm is offset by the pro-competitive benefits. That's a direct quote from page 1160. And now let's go to Judge Gonzales-Rogers' opinion in this case, at page 160 of the excerpts of record, where the Court said here, the Court has carefully considered the evidence in the record and has determined, based on the rule of reason, that the DPLA provisions at issue, app distribution and IAP, quote, that was all a quote, but here's the emphasis, have pro-competitive effects that offset their anti-competitive effects. It's word for word from Tuolumne because, of course, the parties had cited Tuolumne to the Court, and the Court applied precisely that step. It is not a fourth step in the law. It is a logical conclusion, as I think Judge Smith indicated, of the three steps. And in fact, since the Sherman Act was enacted in 1890, no court has ever rendered judgment for a plaintiff in a case in which that plaintiff failed to prove less restrictive alternatives. And this Court need only look to its decision a couple years ago in Austin. Remember, the education-related benefits had less restrictive alternatives. The plaintiff won those claims. The Supreme Court affirmed that. But there was another part of the case, the non-education-related benefits, where the plaintiff failed to prove less restrictive alternatives. The district court ruled for the defendant on those. The plaintiff appealed. This Court affirmed and stopped after the third step. There's no balancing. The Court said a defendant, and I'm quoting now from Austin at page 1294. This Court's Austin. A defendant may escape antitrust liability despite inflicting harm if a court determines that the restraint has a pro-competitive effect and a proposed less restrictive alternative eliminating that restraint is not viable. Counselor, I like Austin, of course, but I just am interested in your take on our Qualcomm case, which seemed to me to say that the fourth step might be needed. What's your comment about that? Certainly, Your Honor. So Qualcomm quoted, of course, that piece from Microsoft, which was a Section 2 case. Microsoft did not apply a balancing step, nor did Qualcomm. I think the easiest way to rationalize it is in Section 2 cases, where this Court has held, of course, in the Kodak case, that there is no express less restrictive alternative. There is a final step after pro-competitive determinations to ensure that the pro-competitive justifications, in fact, offset, counterbalance the anti-competitive effect. That's always, by the way, built in, I would submit, to the pro-competitive justification requirement, right? If it doesn't offset, then it does. And so what you then from the balancing, I'm going to go back to what I started with, your friend Goldstein on the relevant market. As I look at the District Court's opinion, even though she did not say this, it seemed to me she found a foremarket, but the struggle was with the aftermarket, and to me, based on Kodak and NuCal, got to find switching costs and information costs. In your view, did the District Court make any findings about either switching costs or information costs, that if she had gotten the earlier part, in quotes, correct, would have been sufficient to prove up, if you will, EPIC's relevant market position? Right. If I could put a pin in the foremarket and focus first on the aftermarket. Okay. The Court made findings that are, that defeat the aftermarket, regardless of the foremarket, because, first, the entire exercise is inconsistent with Amex. Remember, the Court made a finding, not challenged by EPIC in this Court, and this is important to point out, that the relevant product here is transactions. The product is transactions. And if the product is transactions, then the question is whether the competition in the foremarket, however defined, disciplines activity in the aftermarket as to transactions. And the Court made a specific factual finding at page ER131 that Apple's App Store competes with other transaction platforms on both the consumer side and the developer side for transactions. That defeats the aftermarket test under what comes after the fourth step of New Cal. If you turn the page, it says that we're not done yet. If there is substitution, adequate substitution, then we don't have an aftermarket at all. Let me ask you this. I wrote a case about the National Association of Realtors and the so-called, what do they call them, not secret listings, but pocket listings. Pocket listings, Your Honor. And we tried to apply Amex, which is one of the most confusing antitrust cases I have ever read. But what we found was that you've got basically competitor versus competitor rather than end users, meaning the buyers and the sellers. I think we were right. The Supreme Court will tell us. But in this case, how do you think Amex applies in connection with the market definition? Certainly, Your Honor. The product is transactions. The store is a transaction platform. It facilitates simultaneous transactions between users, customers on the one side, and developers. You would analogize that to the credit card analogy in Amex, I assume. Absolutely, Your Honor. And as the Court probably is aware from the briefing, the two lead experts who are quoted all over in the Amex case both testified in this case, one for Apple, one for Epic. And they agreed on this point, that the App Store is a two-sided transaction market. They actually agreed that the product is transactions. And to get back to your question, Judge Smith, about the aftermarket and the information costs and switching, Epic didn't try this case in a vacuum. Epic brought very, very talented experts. Dr. Evans, who I just mentioned, who the District Court, of course, ended up dauberting on his key opinion on market definition. Dr. Athey, Professor Athey, who Epic put up as the centerpiece of their case on information costs and switching. They had an expert devoted entirely to that subject, almost a full day of testimony, Your Honor. I think Judge Rogers did not, what shall I say, didn't find it very credible, right? She was not impressed, Your Honor, because the witness didn't have any data or empirical evidence. Epic decided not to commission a survey. Epic had no data to support its claim, on which, of course, it had the burden of proof. And the court's ultimate finding in the aftermarket, as on so many other elements, in fact, every element of Epic's antitrust claims, was that it was a failure of factual proof to carry that element. So that however the foremarket is defined, there is no aftermarket proven on this record, both under the fourth prong of New Cal and under the separate requirement of substitution. And, of course, New Cal, that page after the fourth factor, goes through the list of the five factual things that a plaintiff must determine, right? That was a motion to dismiss case, and they said this is a fact, this is a fact, this is a fact. And while you're talking about New Cal, because I know you're going to go down this list, I found her findings on the first three elements okay. I didn't find any support at all for her findings as to the fourth element. Can you help me with that? Yes, Your Honor. So the fourth element, whether the foremarket competition disciplines the aftermarket, is generally broken down in the cases to something called lock-in, right? Are the customers locked into the product? And here the court's finding is that Epic tried but failed. Dr. Athey, who I just mentioned, was put up to prove lock-in. They failed. Usually an antitrust plaintiff trying to prove lock-in does a survey to prove lock-in or switching costs or information costs. Epic chose not to do a survey. So there's no consumer survey. Their expert got blown up. They had no other evidence. They had two documents from Apple's files, both old, that the district court dealt with in a great deal. So this was a classic failure of proof case. They knew there was a challenge. They set this up as a Kodak aftermarket case from the get-go. And by the way, they started two years before the lawsuit was filed. They had antitrust counsel embedded in the company. This was a pre-planned, they worked on this so hard. And that's the one I referred to, right? The project, was it Liberty? Project Liberty. And to go a little further on market definition, Judge Smith, you know, Epic chose this. It's a single developer. There's not a class action. All other developers have settled with Apple. All except a couple, you know, 1%. There's not a class action. It's one very large developer with its own interests at stake that didn't want to pick a fight with the consoles, that didn't want to pick a fight with Microsoft. And so it crafted a market definition only fitting Google and Apple. And this is why I want to come back to the format. I gather from the brief and what you're saying here, it really doesn't matter from your perspective whether the district judge got the law right. Even if she did, there's a failure of proof. So it doesn't matter. Well, she absolutely got the law right. But, you know, under NUCAL, which is everybody agrees is the standard, on the aftermarket piece, it was simply a failure of proof. As to both switching costs and lock-in, she says three times Epic failed to prove lock-in. That is a factual finding. They haven't challenged it as clearly erroneous. They haven't pointed to any evidence that would allow this court to overturn that under what would now be a plain error standard, having disavowed any clear error review. So on that piece, it is. As to the foremarket, it's not the same thing between an operating system and a device. Mr. Goldstein said that today. That was not their theory in the district court for good reason. They're also suing Google. And in the Android ecosystem, there are many different app stores. For two examples, the Google Play Store and the Samsung Galaxy Store. They chose the operating system definition to try to capture a so-called duopoly of operating systems and to exclude the Samsung Galaxy Store from the universe of competition, even though app transactions obviously take place on the Samsung Galaxy Store as Judge Gonzales-Rogers made a specific factual finding. So when they now say, oh, it doesn't matter operating systems or devices, it matters a lot in the Google case. And in fact, their expert, Dr. Evans, couldn't even testify where in the relevant market the Samsung Galaxy Store would be, even though this is a whole case about competing transaction platforms. And so the reason Judge Gonzales-Rogers rejected the foremarket is not just because operating systems are not bought and sold, and they're not, by the way, and there's no case ever holding that that's acceptable. It is because, as she said in the previous sentence, the construct was both artificial and litigation-driven. And Professor Schmalensee, whose testimony on this point she credited and cited in that footnote, testified as to why looking at operating systems rather than devices was an artificial construct prepared for purposes of litigation rather than the commercial realities of the market. I certainly get your point about that, but I'm troubled with how that interplays with Microsoft because Microsoft didn't treat it the way that I think you're treating it. Will you comment on that? Absolutely, Your Honor. Microsoft made, on that piece of Microsoft, the Court of Appeals affirmed a district court factual finding as to what the market was. It didn't have a hard and fast rule that every operating system, integrated or not, necessarily is or isn't a relevant market. But it treated it as a separate product, if you will, right? Well, there's two different pieces here. I want to make sure I get this. Right now we're talking about sort of the for-market piece, and the operating system could be a product if it were licensed or sold. Absolutely. There's no rule against that. The question is whether the way Epic tried its case in this case, did the district court make clearly erroneous factual findings that these operating systems are not the relevant market. Even though Microsoft clearly did find it was a different product, even though they might have proposed that in this case, they didn't, and there was no factual proof to back it up from your perspective. Well, no, they proposed it in this case and then failed to prove it. And that's why, you know, it's very interesting, Your Honor. If you look at page 1 and 2 of the reply brief filed by Epic, it posits six legal questions that the district judge supposedly got wrong. They're a fascinating set of questions because in the abstract they can all be answered in the affirmative. But this isn't an abstract case. This is a case that was tried to judgment. So in the abstract, can different components of software be separate or not separate? Of course. The answer of that has to be yes. But the question before this court in this appeal is, and I'm switching a little bit, Judge, Mr., the tying claim, is IAP a separate product within the meaning of the Jefferson Parish test? And Microsoft doesn't say, as a matter of law, every functionality of a computer is separate. It couldn't say that. Computers have gazillions of functionalities. But Judge Rogers didn't use the Jefferson Parish test, did she? Didn't she use the other test? No, Your Honor. She absolutely used the Jefferson Parish test. She cited Jefferson Parish three times. She found on consumer demand, which is the touchstone under Jefferson Parish, let me get you the exact quote. It's at ER 158. With respect to consumer demand, which is the Jefferson Parish quiz, Epic presented no evidence showing that demand exists for IAP as a standalone product. Once again, failure of proof of an element of their claim. This was not a grand legal principles case. This was a case in which the parties actually agreed before trial on most of the legal issues. We put in a several hundred-page submission on the legal standards, a joint submission, and the court applied that and made factual findings to meet those requirements of new cow for the aftermarkets, Jefferson Parish for tying, and many other things. And on each and every one of them, Epic came up short. I mean, if I could just tell you their main claims. There are factual findings. Market definition. They failed to prove their proposed market. We think that defeats all their claims, but at minimum, and Judge Smith, this comes back to one of your questions to my friend Mr. Goldstein, at minimum, their failure to prove market definition defeats their Section 2 claim because there's no monopoly power and they haven't challenged that ruling. So... You can't have a successful Section 1 or Section 2 claim without the relevant market being correct, can you? Our position is certainly not. But under the district court's market, they didn't prove monopoly power, so the Section 2 claim is gone. Their failure to prove their market definition also is an independent reason to get rid of the tying claim because, of course, it's not just separate products, but separate products in separate product markets, and they failed to prove that IAP was either a separate product or in a separate market because, of course, their market... they tried but failed. You know, they failed to prove... concerted action. Mr. Goldstein got up and said... and the government got up and said, a contract is an agreement. Of course it is. That's not the question for Section 1. The question for Section 1 is, are the specific provisions challenged by the plaintiff unilateral conduct or concerted action? That's a factual question, not a legal one. Wait a minute. A unilateral contract is still, at least under the case law that I understand, is still a contract, and we have a contract, and there are two parties to it. It's concerted action in some way, is it not? Absolutely not, Your Honor. Okay, why not? If you have a contract, it may be an agreement for contract law. That's never been, or certainly not since 1911, the Standard Oil case, which made clear that all contracts are not subject to Section 1, and the Supreme Court has said this over and over again, including in the Monsanto case, the Copper World case, the American Needle case. The question is concerted action, and it's not the contract as a whole. And to be clear, there's some confusion, I think, about our position here. The contract as a whole is a bilateral agreement. It's 53,000 words long, okay? It covers more than 100 pages in the appendix. They are challenging two sentences, less than a fraction of 1% of the entire agreement. Those are the things that are subject to Section 1 analysis. I understand your point about how long the contract is and how obtuse it is, but the fact is both parties entered into it for a time complied with it, arguably. Does that not represent concerted action? It does not, Your Honor, and let me try to tie this to one of your previous questions about horizontal and vertical restraint, because I think it's related. From the day the App Store was created in 2008, when there was no allegation of monopoly or market power, there's no market, Apple made several decisions. One of them was, when they first allowed developers to come on, that all apps had to go through the App Store. That's the primary restraint being challenged here. That is a vertical restraint. That is a distribution restriction, right, that all developers have to submit their apps for review and distribute them only through the App Store. That restriction was imposed first unilaterally and technically. It is hard-coded into iOS. iOS is a collection of patented, copyrighted, trademarked software features that must be used to deliver native apps, and Apple does not allow unapproved apps. This is the certificate, the code signing requirement that's referred to in the opinion. That's a technical requirement. Apple then reflected that in the DPLA. We are telling you, if you use our software, it's a licensing agreement, if you use our software to create an app, you have to submit it through the App Store. That is a unilateral imposition as part of a licensing agreement, which under the Justice Department's IP licensing guidelines at page 9 and 10 is clearly pro-competitive because it prevents competition in the, excuse me, it doesn't present others from competing against the technological features of the App Store. Let me ask you about that because one of the things I noticed in your brief was that things are different in the Mac OS than in the iPhone because basically it's mobile and it goes all over the place. Well, I've got a couple of grandkids that have Macs and they take them everywhere. Yep. And yet, it seems like your position is that because phones are more mobile, that they need more restrictions than the Mac does because, of course, you know, Apple treats Mac differently. What's the real difference here and why should it make an impact on us? The real difference between the Mac and the iOS system is human review. Mac uses purely technical review. The iOS uses a very robust and expensive level of human review. There was extensive testimony from Mr. Federighi and others about this at trial. Apple made that decision for iOS based on its Mac experience. They did not want the phone to be like a computer. Computers are buggy. They crash. They have problems. They wanted the phone to be better and then the iPad and then the phone to be better and it created a much more robust system. You know, it can be likened to the Mac has a lap belt and the iOS has a six-point racing harness. You know, it's safer. So this gets to the pro-competitive aspect. This is the defense that you have to the things that the district court found that there were some anti-competitive natures. So it really boils down to, from Apple's perspective, there really is enough of a difference in the iOS operating system as opposed to the Mac OS that it's justifiable. You also have a difference between the purchase of physical items and non-physical items in the IAP. What's the difference there? So both of those, Your Honor. The court, the district court's market definition is mobile, digital game transactions. That doesn't include Mac. She defined mobile to exclude PCs and it doesn't include physical transactions. She defined it to be only digital. We have to look at the area of effective competition within the relevant market. The market was defined as mobile, digital game transactions. The competing platforms there are the Android stores. And there we have abundant evidence of the pro-consumer benefits that Apple provides by preventing malware, by preventing fraud, by preventing social engineering, by preventing privacy intrusion, by limiting pornography, hate speech, and other objectionable content. So from Apple's perspective, there really, really is a difference here. This was not the district judge making a Solomonic decision, taking a little bit from you and a little bit from the other side and coming up with a relevant market. Your Honor, we propose, to be very clear, a market for all digital game transactions, including on computers. The court found four sub-markets and limited this case to one. We have accepted that for purposes of this case. We've also pointed out in a couple of footnotes that this is a dynamic and evolving market that I suspect in future litigation that issue may have to be revisited. And from your perspective, the Mac issue was a non-issue because the market as defined by the district court did not include Mac. Well, that is one answer to it, Your Honor. There is another answer, which is all platforms, all computing platforms make decisions, or the operators of all platforms make decisions about a variety of things, but they include security and privacy. For iOS, and the evidence was undisputed on this from Steve Jobs' initial announcement speech, which was read into the record at trial, that Apple made the decision to make this the safest, the most secure, the most private computing device the world had ever known. It knew from its experience with Mac what not to do, and it made a better machine. And it made a machine that competes, that beats Mac, it beats PCs, it beats Android devices, it beats everything that's ever been done. Epics expert, Dr. Mickens, a Harvard professor, got up on the stand and testified, nobody does it better than Apple when it comes to privacy and security. Mr. Sweeney, the CEO of Epic Games, testified that he uses an Apple phone because it protects his security and privacy better than anybody else. Dr. Evans, Professor Athey, Epic expert witnesses both testified that security and privacy are pro-competitive justifications and that Apple had an edge over the competition based on security and privacy. And to bring this to where I think Mr. Goldstein was going when he said the only thing kept out by walled gardens is competition, that is just false. And it is totally disproven by the trial record. What's kept out by walled gardens is fraudsters and pornsters and hackers and malware and spyware and foreign governments who wish to hijack the phone and GPS and microphone feature of the device. And Apple, we put a chart in our brief at page 83 that shows that iOS has a minute fraction of these intrusions from everybody else. And this gives consumers a choice. Apple gives consumers a choice. They can go to the open system, which is Android devices, which have many competing app stores. All the things that Epic wants in this case, Android already offers. And they open themselves up to more intrusions, privacy, malware, and so forth. Or they come to Apple and have the closed system, the integrated system, where Apple has human review of every single app, so it's trusted, reliable, safe, secure, private. That's competition. That's competition on non-price features, right, quality features, between the two ecosystems that provide a multiple of platforms, a manifold number of platforms. And the competition there is fierce. And this is Apple's competitive differentiator. Judge Gonzales-Rogers recognized this in scores of factual findings. And they all outweigh the minor, minor anti-competitive effects. On only one side of the platform, by the way. The only anti-competitive effect is increased prices to developers. There are no anti-competitive effects for consumers, whereas every one of these pro-competitive benefits directly benefits consumers. And it also benefits developers through indirect network effects because it makes consumers more likely to transact on the platform. Is it clear, then, that Apple concedes that Mac is an inferior product insofar as the safety features that you're talking about? Not at all, Your Honor. The Mac App Store is the safest PC app store. It's just, it is more open than iOS app stores. Isn't the business decision have a lot to affect? We put a lot more on our phone these days. Anybody under the age of 30 has all of their information, everything about them is on their phone, not necessarily on a PC, is it? Absolutely, Your Honor. And Mr. Schiller, who helped develop the app store, testified at that point at great length at trial that the phone may have your health information, your credit cards, your driver's license, and more and more with these digital wallets, of course, your phone is everything. And protecting it from hacking is the most important thing for Apple. And there's privacy here, too. Privacy is important. Apple protects privacy against large developers. The judge found, a specific factual finding, large developers want to use user data, and Apple will choose its customers over developers. Epic apparently doesn't like that, but Apple is a customer-focused company. Counselor, I know we're jumping to the UCL, but I don't want you to run out of time. The lower court found that your security concerns don't apply to the anti-steering provisions, but then went on to impose relief that had you kind of put things on your buttons and links that look like it's breaking the walled garden. Could you... There was very little analysis done there. There was no analysis done there, and in fact, you know, that Epic didn't ask for a UCL injunction. Anti-steering is nowhere in Epic's proposed injunction. It's in one paragraph of the complaint. It was an adjunct to IAP. There's no standalone anti-steering claim. This was raised by the district court sort of sua sponte during trial. The first time Apple got notice of this was when the order came out. We had no hearing on the injunction. We immediately put in a declaration from Mr. Kuzminka, the head of AppReview, explaining the very significant and deleterious consequences for the ecosystem that would happen to put links and buttons in. If I could detour for one second. Mr. Goldstein says developers can't communicate with consumers. That's false. Apple has deleted one of the two guidelines at issue as part of the developer settlement. He knows that. We've said that. Developers absolutely can communicate all they want. There are no restrictions on communications. The only restriction that remains, and that we asked the court to reinstate, is inside the app, Apple does not allow links and buttons because we can't review them, we can't track them, we can't protect users from malware, fraud, porn, hackers, and all of those other things. It would be a breach in the wall, an opening that bad actors could exploit, and it is not well thought out. It's also not legally founded, if I could come to my friend from California. The Chavez Doctrine has been the law almost as long as Celtic. There is not a single case that has ever, since Celtic was decided, found an antitrust claim not viable and then allowed a UCL claim based on the same conduct to proceed. Today, California offered a new argument, that's not in its brief, that Chavez is limited to cases where a judicial precedent clearly controls, and it does not apply. I wrote this down, what he said is, a failure of an evidentiary burden is not enough to meet Chavez. Well, I would recommend to the court, the Hicks decision from this court, which was a failure to plead a relevant market, so the court dismissed the antitrust complaint for failure to plead a relevant market, and then went on to dismiss the UCL claim under Chavez because of a deficiency in pleading. So, the argument made for the first time today is not correct. It also answers the point Judge Smith about market definition. Why would Hicks have reversed the UCL claim, or thrown out the UCL claim if market weren't relevant? Of course, market is relevant, and the reason for that is CELTEC. CELTEC says under any test, any prong, any theory, you have to show for a UCL unfairness claim significant harm to competition. You cannot assess competitive harms without knowing what the relevant market is. Can I ask you, I know he's, go ahead Thomas, can I just ask you one legal question and one non-legal question? The legal question is that the district court denied attorney fees, I guess it was under the DPLA, based on the Alki Partners case, finding that under California law, the word indemnity and hold harmless basically only applied to third party claims. What's your response to that? So, that is what that case says, but that case also says you have to look at the context. Here we have the indemnity clause, which appears at page 642 of the excerpt of record, it's DPLA section 10, has six separate contexts in which indemnity may be required. Many of them are third party claims, claims by customers for use of the app, and of course that would be right. But the first one, and the one that we invoked here, is a first party claim, which is claims for breach of contract.  because the DPLA also contains a provision that says no third parties may enforce this agreement, which is a standard contract clause. So, there is no third party claim as to the provision at issue. I think the district court was a little too generic in looking at that provision rather than looking at the specific clause, which is clause one, little I, Romanet I of section 10 of the DPLA. Okay. One other question, this has absolutely nothing to do with your argument or anything, but I'm just puzzled. I know you're a long term partner at Gibson Dunn, and yet you're filing under Weill today. Who's not in the case anymore? Is it Gibson or Weill? So, I am now at Weill. My colleagues from Gibson are here. We are one big happy family. There you go. And we have a wonderful client who has plenty of law firms and good lawyers, Your Honor. Very good. Well, thank you for answering that question. Very good. Thank you, counsel. We'll hear rebuttal. And Mr. Goldstein will give you the full five to equalize the time. Thank you, Your Honors. My friend's principle argument, and I think when it comes to their privacy and security justification, is of course that they're differentiating themselves from Android phones. Note, of course, that that's inconsistent with their notion of what the market is. They really are acknowledging here that it's Android against iPhone. And just take the following hypothetical and ask if this would be legal. Apple contracts with Google and says, look, let's differentiate our products. We'll have just this thing we'll call the walled garden, and you go off and have all your app stores. And they'll say, well, that's a pro-competitive justification because we've differentiated them. That argument we laughed out of court as this one should be as well. You cannot block horizontal competition between app stores and between IAP providers and use as your excuse that I am now going to offer a product that is differentiated by the fact that it lacks any competition. And that is particularly true when the prohibition on competition exists at a level, the app store and the IAP, in order to product differentiate at an entirely different market about the iPhones. You don't get to squash competition between the app store makers and the IAP providers in order to differentiate your product. And that, I think, is exactly what Apple is claiming the power to do here. But as I said in the very first point that I made about this supposed justification, I don't even understand where it begins. Apple wants to offer a product that we'll call the walled garden iPhone. Have at it. Sell that product to consumers. Tell them, use only our app store. Use only our IAP. What the law does not permit is then Apple to say, look, I'm not going to allow even a competitive alternative. I'm not just going to just tell my customers that I'm going to forbid them by contract and by technology from using the Disney app store that might be even more protective or the one that's cheaper. What the law allows is Apple can engage in product differentiation. But what it can't do is take a million users in a market in which the district court finds that it gathers tens of billions of dollars in super competitive profits every single year and use that as the excuse to eliminate all the putative competition that would be available. Counsel, let me ask you this. We have the benefit of having some really excellent lawyers today, and I think it's great. But I am troubled by one overriding concern. You and Mr. Kelly obviously disagree about the law. Of course, there's the state and the government. But the one thing that really troubles me is this failure of proof. I read Gibson, Dunn, Slash, Wiles' brief, and they repeat over and over and over again. They take elements that are required to be proven under certain things and at least looking at the record, it seems that they have made a pretty good case for failure of proof. What's your response to that? What am I missing? What you're missing, I think, is the way that the district court's opinion whipsaws us. Because if you do read the first three quarters of the opinion, you are convinced we are going to win because the district court, with the exception of lock-in, details all the things that I'm saying about the anti-competitive effects, how competition would improve quality and lower price. But with respect, and I like Judge Rogers a lot, but she's inconsistent. She says one thing, and then she gets to another point. It's hard to make it square. So what do we do with that? The Supreme Court has decided in a series of cases that we cite, not read. The Supreme Court has made quite clear that what you do in that situation is that you look to the, this is the United States v. General Motors case, I think, where the Supreme Court says you look at the findings of fact. And then, if the district court, in applying the findings of fact, is not either following the findings of fact or engaging in legal errors, then what you do is you apply the finding. The other thing is that a lot of what we're talking about here is not a finding of historical fact, which is subject to clear error review. It's the application of law to fact. So take, for example, the fourth Newcal factor, when we're talking about whether competition in the foremarket will temper anti-competitive behavior in the aftermarket. The district court says there's no lock-in. Well, that's effectively a legal conclusion. What we are really looking at is the actual facts. What is it that is happening between Apple and Google or Apple and other games providers that is causing it to behave better, supposedly, and not charge the super competitive fee? And the answer is nothing at all. It has been completely immune to price competition. The last thing I would do is just to return to what I began with, and that is I think this case is inevitably getting to a rule of reason inquiry under Section 1, whether it's the unilateral conduct, it's the tying question, what have you. And the most important thing, I think, is to temper and reverse the district court's view that it is okay for Apple to eliminate competition in order to differentiate its product in the horizontal markets that involve app stores and in-app payments, which are billion-dollar markets. I never got an answer from you on that. If I could, that's one thing. Project Liberty, does that make any difference? No. You know, we are a would-be competitor. That's the role that we're playing here. You are a competitor. Your Honor, if so, we've got no customers. We want to have an app store. Apple says you are not allowed to have that app store. We want to offer in-app payments to iPhone users. We are not allowed to do it. We're a would-be competitor. The district court was very clear about that. So you're right if it's a walled garden. I'm sorry? You're right if it's a walled garden. I'm right. You can attach whatever label you want and however high the wall. Apple, by contract and by unilateral policy, principally by contract under Section 1, forbids us from using an alternative app store and forbids anybody from using our app store. Thank you, Counsel. Thank you. Thank all of you for your arguments today and presentations. Very helpful to the Court. And we will be in recess.
judges: THOMAS, SMITH, McShane